[No. H026428. Sixth Dist. Sept. 16, 2004.]

NIZAR YAQUB, Plaintiff and Appellant, v.
SALINAS VALLEY MEMORIAL HEALTHCARE SYSTEM et al.,
Defendants and Respondents.

## COUNSEL

Spiegel, Liao & Kagay and Charles M. Kagay for Plaintiff and Appellant.

Abramson, Church & Stave, Kelly McCarthy Sutherland; Hanson, Bridgett, Marcus, Vlahos & Rudy, Michael A. Duncheon and Jacquelyn J. Garman for Defendants and Respondents.

## OPINION

**ELIA, J.**—In this appeal Nizar Yaqub, M.D., seeks review of the superior court's denial of his petition for a writ of mandate and his motions for vacation of judgment and a new trial. He contends that the petition should have been granted because respondent, Salinas Valley Memorial HealthCare System (SVMHS), denied him a fair administrative hearing before revoking his hospital privileges at Salinas Valley Memorial Hospital (SVMH or the hospital). Appellant specifically contends that the presiding officer at the hearing before the "Fair Hearing Panel" (Hearing Panel) had a financial conflict of interest that should have disqualified him from conducting the hearing. He also contends that the presiding officer improperly denied him the opportunity to present testimony of the physicians who had signed the charging documents. Appellant further argues that the composition of both the Hearing Panel and the "Appellate Review Panel" (ARP) violated his right to due process and a fair procedure because the panels were comprised of the same people who had suspended his hospital privileges in a prior proceeding. The appellate review process, appellant contends, was also unfair because the ARP sought advice from an attorney who had advocated against him in the matter, and because it "revers[ed] an unappealed finding" of the Hearing Panel and substituted its own factual findings. Finally, appellant contends that the Hearing Panel's determination that he failed to provide for the care of his patients is not supported by substantial evidence.

We agree with appellant that the hearing officer should not have presided over appellant's "Fair Hearing." Accordingly, we will reverse the judgment. We reach additional issues only where necessary to guide the parties in any further proceedings in this matter.

### Background

Appellant's privileges at SVMH were restricted in a previous proceeding before a review panel of the SVMHS board of directors. That matter culminated in a decision on July 13, 2001 in which the board suspended his surgical privileges except for caesarean sections. The board ordered him to

take courses on interpersonal relations within three months and refrain from performing procedures for which he was not credentialed. The board also ordered appellant to submit to the hospital's "Medical Executive Committee" (MEC) a plan naming the physicians who would care for his patients during his 90-day suspension. Appellant was informed that if he violated any applicable bylaws, rules, or regulations, he would be summarily removed from the hospital staff. Appellant's petition for a writ of administrative mandamus was denied by the superior court, and this court upheld that ruling in an opinion filed January 15, 2004 (*Yaqub v. Salinas Valley Mem. Healthcare Sys.* (Jan. 15, 2004, H024953) [nonpub. opn.]).

On July 16, 2001, in accordance with the board's suspension order, appellant was instructed to submit his plan for his patients' care within three days. Appellant was told to coordinate the plan with Dr. David Perrott, a vice-president and medical director at the hospital. Appellant requested a two-week extension to allow time for "an orderly transition of care for his patients during the period of the suspension." The hospital granted him a six-day extension for only nonelective obstetrical procedures. In the same letter, which was addressed to appellant's attorney, Arnold B. Myers, the hospital's attorney, noted that it was "Dr. Yaqub's responsibility to contact his patients and make arrangements with them to provide for their care at Natividad, another hospital in the area, or with another practitioner. Dr. Yaqub should understand that this implementation schedule must be rigidly adhered to so he will be in compliance with the Board of Directors' Decision."

On July 24, 2001, appellant's attorney, Barry King, notified counsel for the hospital that despite a "desperate effort" appellant had been unable to find anyone to cover his practice. According to King, appellant had expected that Drs. Halfpenny and Ross would provide coverage, but they had just informed him that they were not able or willing to do so.[1] None of the other physicians with staff privileges at the hospital were willing to take his patients. Appellant refused to "coerce or force" any of his patients to deliver their babies at a hospital they did not choose, even though he had privileges at Natividad Medical Center (Natividad), also in Salinas. Appellant requested that the hospital *require* the other OB/GYN physicians to cover his patients. Alternatively, he requested a further extension for a "sufficient" period to enable him to find "the appropriate medical personnel" to care for his patients.

The hospital rejected both proposals. Myers responded the next day that Natividad was an accredited facility specializing in obstetrical care. Myers stated that appellant had a duty to inform his patients by July 25 that (1) he

---

[1] Appellant clarified at his Fair Hearing that Dr. Halfpenny did not agree to cover appellant's entire patient load, but only promised to help in any way he could. Appellant said he did not even request full coverage from Dr. Halfpenny but only asked whether Dr. Halfpenny could cover certain complicated cases.

could deliver their babies at Natividad; (2) they could arrange for care by other obstetricians in the community; and (3) if they appeared at SVMH without an assigned physician, they would be cared for by the obstetrician on call.

Dr. Perrott incorporated this statement into a memorandum distributed to the obstetrical physicians at the hospital. The memo, prepared by Dr. Perrott in consultation with appellant, briefly explained that appellant had the responsibility to inform his patients that (1) he had privileges at Natividad; (2) patients could arrange for care from other physicians in the community; and (3) if they went to SVMH without an assigned physician they would be cared for by the physician for unregistered obstetrical services. The memo specifically warned the staff that "there may be Dr. Yaqub patients presenting to SVMH for obstetrical care."[2] Appellant regarded the memo as equivalent to the required plan for coverage. He believed that he had a plan as of July 24: that the obstetrician on call would deliver the babies of his patients who came to the hospital. After receiving no objection for 30 days, he assumed the plan was accepted. Dr. Perrott testified, however, that he had not intended in the memo to communicate any commitment by the hospital to care for unassigned patients; the only purpose of the reference to the on-call physician was to ensure the staff's compliance with all applicable laws prohibiting the refusal of care to women in active labor.

Effective July 29, 2001, appellant resigned from the medical staff at Natividad. Beginning August 2, 2001, patients began appearing at SVMH, unaware that appellant's privileges had been suspended and expecting him to deliver their babies. In each case the obstetrician on call handled the delivery. On August 23, 2001, Sam Downing, the president and chief executive officer of the hospital, wrote to appellant and King, stating that appellant had not complied with several requirements of the July 13, 2001 decision, including the order that he provide a plan of care for his patients and notify them of his suspension. In the hospital's view, this failure, together with the resignation of his privileges at Natividad, raised "serious questions of abandonment of his patients. At this point, his patients are left without a choice: they do not know he has no privileges at Salinas Valley Memorial Hospital; he cannot care for them at Natividad Medical Center by his own volition; and they have not been transferred to a physician who has taken over for Dr. Yaqub." Downing also asserted that appellant had not taken the required courses on interpersonal relations and had not completed his patient medical records by July 19, 2001.

---

[2] The original draft of the memo stated, "Therefore, while many patients may transfer care to another facility or make arrangements to have another physician provide obstetrical services, there may be Dr. Yaqub patients presenting to SVMH for obstetrical care." Dr. Perrott removed the dependent clause at appellant's suggestion, based on appellant's prediction that "the overwhelming majority will show at SVMH."

The hospital demanded that appellant complete those records and submit a written plan of care to Dr. Perrott within 24 hours. The next day appellant's attorney notified Dr. Perrott that appellant had completed the records, that patients had and were being told about the suspension, that appellant was still seeking a temporary replacement (*locum tenens*), and that letters had been sent to all staff OB/GYN physicians asking for their assistance in covering appellant's practice. The following week King announced that all prenatal records through the end of September 2001 had been sent to the hospital, and he sent Dr. Perrott a proposal for a course in conflict resolution.

On September 7, 2001, Myers notified King that appellant had not yet "presented a comprehensive written plan of care" for his patients. The matter was referred to the hospital's MEC for review. King responded immediately, pointing out that appellant had asked for coverage from Dr. Gilbert, a physician in another practice, but had yet received no response. Arranging *locum tenens* was a time-consuming process, King noted. Drs. Ross and Halfpenny, however, were expected to be available to cover urgent-care patients. King also told Myers that appellant had more than 65 patients with delivery dates projected for the suspension period, and that the "vast majority" of the OB/GYN community had privileges at SVMH but were hostile toward appellant. Myers rejected these excuses, reminding King that it was appellant's, not the hospital's, obligation to provide a plan for coverage, and insisting that the hospital's emergency room was not such a plan. On September 12, 2001, Myers provided King with a list of sources appellant could use for *locum tenens*. The hospital refused appellant's request to share the cost of *locum tenens*. On September 21, 2001, appellant notified Dr. Perrott that Dr. Mark Preston would cover his practice from September 22 to October 3, 2001.

On September 14, 2001, appellant received notice that the MEC was conducting an investigation to determine whether he had complied with the board's July 13 decision. Appellant appeared before the MEC on September 25, 2001. On October 12, 2001, the MEC suspended appellant's membership and privileges at the hospital, effective October 16, and recommended that those privileges be revoked. The MEC cited appellant's failure to (a) provide a plan of care for his patients, (b) complete courses on interpersonal and peer relations, and (c) notify his patients of his inability to care for them at SVMH. The MEC listed 12 examples of patients who had arrived at the hospital for delivery of their babies between August 2 and September 12, 2001. In each case the obstetrician on call delivered the baby, except for one, who was delivered by the nurses before the obstetrician arrived. The MEC specifically noted eight of these patients who were unaware that appellant would not be able to deliver their babies. In four cases the hospital did not have prenatal records. On October 26 the MEC amended its notice of charges to add six more patients who were unaware of the suspension. For five of

them, the prenatal records were not at the hospital. All of these patients appeared at the hospital between October 21 and October 24, beyond the original suspension period. On November 27, the MEC added another charge related to patient care, along with a new charge of failing to maintain malpractice liability insurance.

Appellant requested a Fair Hearing as provided for in the hospital's bylaws. In response, the hospital sent him a final notice of the charges and proposed action. The notice also informed appellant that Justice Nat A. Agliano (ret.) had been appointed as an independent hearing officer for the proceeding. The Hearing Panel was to be composed of Elizabeth Helfrich, Esq., William Keller, M.D., and Robert Van Horne, M.D. All three of these panel members had served on the Hearing Panel in the previous proceeding, and Justice Agliano had served as the hearing officer.

Appellant objected to the appointment of Justice Agliano as hearing officer, and to all three of the Hearing Panel members. Because Justice Agliano had presided over the prior hearing, appellant believed that he might have already formed an opinion regarding the issues before him. Moreover, appellant suggested that Justice Agliano might not be impartial because his conduct in the prior proceeding was under judicial scrutiny. In addition, Justice Agliano had presided over a number of Fair Hearing proceedings at the hospital, resulting in "significant financial gain" to him, which presented another likely source of bias in the hospital's favor. Finally, appellant pointed to a "shocking" disclosure by the hospital: Justice Agliano had once served on the Board of Governors of the SVMH Foundation, whose mission was fundraising for the hospital.

Appellant also objected to the three members of the proposed Hearing Panel on several grounds, including the fact that all had served on the Hearing Panel in the prior proceeding. According to appellant, the selection of these three violated the hearing provisions in the hospital's bylaws. After voir dire of each member and argument by counsel, the hearing officer overruled appellant's objections.

Appellant's Fair Hearing took place between January 9 and March 21, 2002. On April 15, 2002, the Hearing Panel issued its decision and recommendations. It found unproven the charges that appellant had failed to "take" courses in interpersonal relations, that he had failed to maintain malpractice insurance, and that he had failed to provide a plan for patient care. Nevertheless, that plan "was not a plan at all," because appellant had "willfully nullified" and "abrogated" it by resigning from Natividad and forcing his patients onto the on-call physicians at SVMH. The Hearing Panel described appellant's uncooperative conduct as "irrational . . . arrogant, defiant, and a

threat to patient safety." It was "particularly egregious," in the panel's view, because it was a response to a board order designed to correct his past conduct. Accordingly, the Hearing Panel agreed with the MEC in recommending revocation of appellant's membership and privileges at SVMH.

Appellant sought review by a review panel unassociated with the hospital. At the ensuing hearing, the entire board of directors constituted the ARP. Appellant objected to the inclusion on the panel of three members, citing individual conflicts of interest and the members' participation in the prior review proceeding. He asserted two grounds for his appeal: a prejudicial failure to abide by "applicable laws" and insufficiency of the evidence to support the Hearing Panel's decision. Though it did not appeal, the MEC disputed the Hearing Panel's finding that appellant had provided a plan of care for his hospital patients.

After reviewing the record and hearing argument from both sides, the board issued its decision. It first rejected appellant's procedural challenges and his proposed disqualification of the board members from hearing the appeal. After addressing various evidentiary requests, the board considered the challenge to the factual conclusions and recommendations of the Hearing Panel. The board found insufficient evidence to support the Hearing Panel's finding that appellant had created a patient-care plan as required by the July 13, 2001 decision. The July 26, 2001 memorandum from Dr. Perrott to the obstetrical staff was inadequate, the board concluded, because it failed to name the physicians who would care for appellant's hospital patients, it did not contain all the elements of the required plan, and it was intended only to notify staff of appellant's status. In any event, the board found, the evidence was clear and convincing that appellant had "failed to abide by the terms of that plan and to provide for the care of his patients in a manner consistent with it." The board finally concluded that the "overwhelming weight of the evidence" supported the Hearing Panel's determination that appellant was not qualified to be on the hospital's staff.[3] Accordingly, the board upheld the summary suspension and revoked appellant's staff membership and clinical privileges at the hospital.

---

[3] In the board's view, even if Dr. Perrott's memorandum constituted the required plan, nevertheless "Dr. Yaqub did not sufficiently advise his patients that he would not be available to care for them at the Hospital. Dr. Yaqub did not adequately provide for the care of his patients during the period of his suspension. Dr. Yaqub continues to be unwilling and unable to cooperate with Hospital management, his peers, and his colleagues in the orderly and proper administration of the Hospital. Dr. Yaqub's conduct and attitude are arrogant and defiant. And last, but not least, Dr. Yaqub's conduct and attitude pose a continuing threat [to] patient safety. [Fn. omitted.] These findings compel the conclusion that Dr. Yaqub's continued practice at the Hospital posed an immediate danger to the health of its patient[s], and the ARP so finds."

On September 25, 2002 appellant filed a petition in superior court for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. Among the grounds he asserted were (1) the appearance of bias of the hearing officer, which should have disqualified him from presiding; (2) improper constitution of the Hearing Panel and the ARP; (3) improper factfinding by the ARP; (4) error in the hearing officer's preclusion of testimony by two witnesses; and (5) insufficiency of the evidence to support the revocation of his membership and privileges. After receiving written and oral argument, the trial court declined to issue the writ and subsequently entered judgment for SVMHS.

## Discussion

### 1. Scope and Standard of Review

The issues presented in this appeal fall into two general categories: (1) the fairness of the proceedings before the Hearing Panel and the ARP; and (2) the sufficiency of the evidence supporting the ARP's decision. Code of Civil Procedure section 1094.5 (section 1094.5) governs our review, which follows the same course as that of the superior court. The court's inquiry in an administrative mandate matter includes the questions of whether there was a fair trial and whether there was any prejudicial abuse of discretion. (§ 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) In a case arising, as here, from a decision by a board of directors of a hospital district, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (§ 1094.5, subd. (d).) Whether the hospital's determination was made according to a fair procedure is a question of law, which we consider independently based on the administrative record. (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101 [63 Cal.Rptr.2d 743].)

### 2. Fairness of the Proceedings

#### a. Bias of Hearing Officer

Appellant contends that issuance of the writ was required because the presiding officer at the Fair Hearing had a "fatal appearance of bias" caused by a financial conflict of interest. Justice Agliano, appellant argued, had a "long-standing and continuous" relationship with SVMH: He had previously served on the Board of Governors of the SVMH Foundation, a corporation that raised money for the hospital, and whose governors were elected by the

hospital's board of directors; he had served once as a mediator and once as an arbitrator in cases involving the hospital as a party; he had been engaged and paid by the hospital to be a hearing officer in at least two other SVMH cases concerning physician privileges; and he had been the presiding officer in appellant's earlier Fair Hearing. These circumstances, in appellant's view, created an "irreconcilable" economic conflict that compelled Justice Agliano's disqualification without regard to whether any actual bias was discernible. He renews these arguments on appeal.

■ Appellant cites *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017 [119 Cal.Rptr.2d 341, 45 P.3d 280] (*Haas*), where an administrative hearing officer's pecuniary interest disqualified her from presiding over a license revocation matter. In *Haas*, a hearing took place on the county's revocation of Haas's business license. Haas objected that the appearance of bias necessitated the hearing officer's disqualification because she had been selected and paid by the county, which foresaw using her as a hearing officer in the future. The Supreme Court held that "[c]ounties that appoint temporary administrative hearing officers must do so in a way that does not create the risk that favorable decisions will be rewarded with future remunerative work." (*Id.* at p. 1020.) The appointment procedure used by the county did create that risk because the county, as prosecuting agency, unilaterally selected the hearing officer, whose future employment in that capacity depended entirely on the goodwill of the county. In other words, "a direct, personal, and substantial pecuniary interest does indeed exist when income from judging depends upon the volume of cases an adjudicator hears and when frequent litigants are free to choose among adjudicators, preferring those who render favorable decisions." (*Id.* at pp. 1031–1032.)

We believe that the circumstances presented in this case fall within the ambit of *Haas*. Pursuant to Appendix Section II(G) of the hospital bylaws, the MEC unilaterally appointed Justice Agliano as hearing officer, and his fee was paid by the hospital.[4] In notifying appellant of the appointment the MEC disclosed that Justice Agliano was "not affiliated with the MEC, or the Hospital, but he used to be a member of the Board of Governors of the Salinas Valley Memorial Hospital Foundation. His term ended December 31, 1998. The Foundation is a 501(c)(3) non-profit corporation whose mission is fundraising for the Hospital." The MEC further explained that the SVMH Foundation had no involvement in any medical staff matters, which were the responsibility of the board of directors. However, the board of directors elected the Board of Governors of the SVMH Foundation.

---

[4] The fee was paid through JAMS, which contracted with Justice Agliano to provide his services as hearing officer.

This disclosure was one of the grounds on which appellant's objection to the appointment was based. He also pointed out that Justice Agliano had presided over three Fair Hearing proceedings in the past, including his own suspension hearing, and there was the potential for further appointments in the future. These facts were sufficient to create a "possible temptation" to favor the hospital.

It is true that Justice Agliano, unlike the hearing officer in *Haas*, did not serve as fact finder, participate in the deliberations, or issue a decision recommending action by the administrative board.[5] Yet, as permitted in the bylaws, he provided key rulings on admissibility of evidence and access to information.[6] He also ruled on the challenge to his own appointment as hearing officer, a determination upheld by the board itself.[7]

We also acknowledge that there was no evidence of actual prejudice or of a direct financial interest in the outcome of the case. As both the ARP and the trial court observed, "the administrative record shows that the present hearing was conducted fairly and even-handedly by the presiding officer."[8] The court further noted that in a previous proceeding conducted by Justice Agliano the Hearing Panel had ruled in favor of the physician. Nevertheless, the Supreme Court emphasized in *Haas* that "the risk of bias caused by financial interest need not manifest itself in overtly prejudiced, automatic rulings in favor of the party who selects and pays the adjudicator." (*Haas, supra,* 27 Cal.4th at p. 1030.) " 'The Court's inquiry . . . is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a "possible temptation" to the "average man" as judge.' " (*Id.* at p. 1029.)

The trial court itself advised the board to "reevaluate the selection process for hearing officers" in light of *Haas*. Its suggestion was well taken. This case illustrates the necessity for careful examination of potential

---

[5] The record also contains no direct evidence regarding the hearing officer's assistance to the Hearing Panel in its deliberations at this proceeding. The record does indicate that in appellant's *prior* hearing on the suspension, Justice Agliano advised the Hearing Panel that the MEC had the burden of proof and that the charges must be proved by a preponderance of the evidence. Dr. Keller, one of the Hearing Panel members, recalled receiving such instruction and added that the panel had "felt well guided throughout the proceedings."

[6] Under the hospital's bylaws, the presiding officer "ensures that all participants have a reasonable opportunity to be heard, maintains order, determines the order of procedure of the hearing in accordance with these bylaws, and makes rulings on questions pertaining to matters of procedure and admissibility of evidence."

[7] The ARP found that "the selection of Justice Agliano and the panelists did not violate any of the various applicable statutes, the Bylaws, or principles of due process/fair procedure."

[8] In the ARP's view, "not only is there no evidence of bias on the part of these individuals that impacted the fairness of the subsequent hearing and decision-making process, but there is no evidence of bias whatsoever."

financial conflicts of interest in the selection of administrative hearing officers to obviate even the possibility of bias. Principles applicable to judicial officers in court proceedings provide comparable guidance; for example, Code of Civil Procedure section 170.1, subdivision (a)(3), states that a judge must be disqualified if he or she "has a financial interest in the subject matter in a proceeding or in a party to the proceeding." And canon 2 of the California Code of Judicial Ethics states that a judge "shall avoid impropriety and the *appearance* of impropriety in all of the judge's activities." (Italics added.) The commentary to this canon provides an objective test for the appearance of impropriety: The question is not whether the judge is actually biased, but "whether a person aware of the facts might reasonably entertain a doubt that the judge would be able to act with integrity, impartiality, and competence." (See, e.g., *Hall v. Harker* (1999) 69 Cal.App.4th 836, 841 [82 Cal.Rptr.2d 44], disapproved on another ground in *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336 [9 Cal.Rptr.3d 97, 9 P.3d 497].) Measured by these standards and underlying principles, SVMHS's procedures for appointing hearing officers were not consistent with the appearance of impartiality. Appellant's objection on this ground was sound, and his petition for a writ of mandate should therefore have been granted.

Because it is likely that a new Fair Hearing will take place, we will address appellant's challenge to the composition of the Hearing Panel. It is not necessary, however, to discuss the exclusion of evidence made by the hearing officer, as such rulings are moot, or the sufficiency of the evidence supporting the Hearing Panel's decision. It also would be premature to consider appellant's objections to the composition or findings of the ARP, since we have no way of knowing if another appellate review hearing will even take place and, if so, whether the same members will constitute the ARP. We do caution, however, that if an appellate review hearing does take place without counsel for either side, it would strain the bounds of due process to allow the hospital's attorney, who took an active role in assisting the MEC to bring charges against appellant, to serve as advisor to the board in the hearing. (See *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 94–95 [133 Cal.Rptr.2d 234] [city attorney's assistance and advice to hearing officer at administrative review hearing constituted an impermissible "overlapping of advocacy and decisionmaking roles" in violation of due process, as attorney had taken an active and significant role as advocate for the city in prior proceedings (italics omitted)]; see also *Quintero v. City of Santa Ana* (2003) 114 Cal.App.4th 810, 814–816 [7 Cal.Rptr.3d 896] [city attorney's interactions with board on other occasions suggested probable influence and appearance of unfairness].)

###### b. *Composition of the Hearing Panel*

Appellant renews his claim that the Hearing Panel was improperly consti-tuted because its members had all served on the Hearing Panel in appellant's suspension proceeding. This time the panel members "were faced with the impossible task of wiping their mental slates clean and conducting an unbiased hearing" in which they had to "judge the feasibility" of the restrictions they had imposed on the earlier occasion. Thus, reconstituting the panel was, in appellant's view, a violation of Business and Professions Code section 809.2, subdivision (a), and section II(F) of the Appendix to the Medical Staff Bylaws, and it "guaranteed" the unfairness of the new hearing.

■ Business and Professions Code section 809.2, subdivision (a), re-quires a hospital's peer review hearing to be held before an arbitrator or "a panel of unbiased individuals who shall gain no direct financial benefit from the outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter, and which shall include, where feasible, an individual practicing the same specialty as the licentiate." The applicable bylaws provision similarly prohibits service on the panel of any staff member who has "actively participated in the consideration of the matter at any previous level . . . ."[9]

Appellant contends that the composition of the Hearing Panel violated these provisions because its members had served as "factfinder and decision-makers" in the first proceeding. However, we agree with the trial court's determination that this was not "the same matter." As the court observed in denying the writ, "[t]he clear intent of these prohibitions is to preclude a member from sitting on a panel and reviewing its own decision made in a previous hearing. That is not what happened here. . . . The first hearing and appeal dealt essentially with the Petitioner's level of medical competency and patient care. The second hearings . . . dealt with his compliance with the conditions of his suspension."

"The rule against overlapping functions . . . applies to prevent participation at ascending levels of the process, so that a participant will not be in the position of reviewing his own decision or judging a man whom he has either charged or investigated." (*Rhee v. El Camino Hospital Dist.* (1988) 201

---

[9] Section II(F) of the Appendix to the Medical Staff Bylaws states, in pertinent part: "The Medical Executive Committee shall appoint a Hearing Panel. The Hearing Panel shall include not less [*sic*] than three members, at least two of whom must be physicians; one member shall have the same healing arts licensure as the physician requesting the hearing. Medical staff members who have actively participated in the consideration of the matter at any previous level, or who are in direct economic competition with the physician requesting the hearing, are not eligible for appointment to the hearing panel."

Cal.App.3d 477, 499 [247 Cal.Rptr. 244].) Because the current proceeding was not a different level of the same matter, the use of the same panel members did not pose the risk that they would be directly reviewing their own decision.

All of the Hearing Panel members were subjected to voir dire; all were confident in their ability to decide the current matter fairly and independently of the previous decision, even if appellant challenged the practicability and fairness of that decision. As this court recognized in *Rhee*, "prior knowledge of the factual background [that] bears on a decision is not sufficient to disqualify a decisionmaker." (*Rhee v. El Camino Hospital Dist., supra*, 201 Cal.App.3d at p. 499; compare *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 660 [163 Cal.Rptr. 831] [unfair procedure where ad hoc committee's decision would be reviewed by executive committee, of which five members had served on ad hoc committee].) The bylaws also reflect this view, stating that "[k]nowledge of the matter involved shall not preclude a member of the medical staff from serving as a member of a Hearing Panel." Absent additional evidence that the panel members could not be impartial, their service in the prior matter did not, standing alone, disqualify them from participating in this proceeding. No violation of either the statute or the bylaws occurred in these circumstances.[10]

## Disposition

The judgment is reversed. The trial court is directed to grant appellant's petition for a writ of mandate and order the challenged decision to be set aside. Costs on appeal are awarded to appellant.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied October 6, 2004, and respondents' petition for review by the Supreme Court was denied January 12, 2005. Brown, J., was of the opinion that the petition should be granted.

---

[10] Appellant makes a brief assertion that the Hearing Panel members had "disabling conflicts" but does not supply supporting argument, beyond the mention of Dr. Van Horne's "economic interest" in having sold the hospital a telephone network. We addressed a more fully developed argument on this point in *Yaqub v. Salinas Valley Mem. Healthcare Sys., supra*, (H024953). For both of these reasons it is unnecessary to consider in the present appeal whether disabling conflicts existed.